IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RANDY LIEBICH, ) | |
| ) | No. 20 C 2368 |
| Plaintiff, ) | |
| ) | Magistrate Judge M. David Weisman |
| v. ) | |
| ) | |
| PAUL SEVERIN, et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

This case is before the Court on the motions for summary judgment of defendants Drs. Paul Severin and Lorenzo Muñoz and Rush University Medical Center. For the reasons set forth below, the Court grants in part and denies without prejudice in part the doctors' motion [309] and denies without prejudice Rush's motion [308, 325].

**Facts**

In February 2002, plaintiff and his girlfriend, Kenyatta Brown, lived together with their infant daughter and Brown's two-year-old son from a previous relationship, Steven Quinn, Jr. (Pl.'s LR 56.1(b)(2) Stmt. ¶ 1.) On February 8, 2002, Brown left the children in plaintiff's care while she worked from 10:00 a.m. to around 4:30 p.m. (*Id.* ¶ 2.) When Brown returned from work, she noticed that Steven was "breathing funny," and she and plaintiff took Steven to Mount Sinai Hospital. (Pl.'s LR 56.1(b)(3) Stmt. ¶ 4.)

At Mount Sinai, Steven was treated by Drs. Paula Green and Tracy Boykin. (*Id.* ¶ 5.) The doctors noted that Steven was posturing, which is a sign of severe brain injury. (Pl.'s LR 56.1(b)(2) ¶ 4.) Dr. Boykin reviewed the CT scan of Steven's head, which she said was consistent with severe traumatic brain injury. (Defs.' LR 56.1(a)(2) Stmt., Ex. C, Boykin Dep. at 26.) Dr. Green asked

Dr. Muñoz to evaluate Steven, and he told her to send Steven to Rush. (Pl.'s LR 56.1(b)(2) Stmt. ¶¶ 4-5.)

After arriving at Rush, Steven was evaluated by Drs. Severin and Muñoz. (*Id.* ¶¶ 7-8.) Dr. Muñoz decided to operate on Steven via craniectomy, opening a flap in his skull to relieve pressure in his brain. (Pl.'s 56.1(b)(3) Stmt. ¶ 7.) Dr. Muñoz's record of operation states that the surgery was undertaken because: "Upon looking at the CT scan, there was a question of a right frontal parietal subdural hematoma. However, it was also thought that this could also be a rather profuse subarachnoid hemorrhage." (*Id.*, Ex. 12, Record of Operation at 1.) The surgery did not improve Steven's condition because he had a subarachnoid hematoma, which cannot be evacuated by a craniectomy, not a subdural hematoma. (Pl.'s LR 56.1(b)(3) Stmt. ¶ 7.) After the surgery, Drs. Severin and Muñoz determined that Steven was brain dead. (Pl.'s LR 56.1(b)(2) Stmt. ¶ 9.)[1]

Dr. Severin said it was his opinion based on his examination of Steven and "review[ing] [the case] in detail with house staff, CPS, neurosurgery, neurology, and pediatric surgery" that Steven's injuries were the result of non-accidental trauma. (Defs.' LR 56.1(a)(2) Stmt., Ex. D, Severin Dep. at 312-14.) Likewise, Dr. Muñoz said he concluded that Steven's death was caused by a traumatic injury to the head. (*Id.*, Ex. E, Muñoz Dep. at 226.) Both doctors say they did not consider whether Steven's brain death could have been caused by anything other than head trauma. (*Id.* at 214-15; Defs.' LR 56.1(a)(2), Ex. D, Severin Dep. at 180.) Dr. Borgialli, one of plaintiff's medical experts, says that Drs. Muñoz and Severin's "opinions were incompatible with both basic medical training and emergency medicine standards in 2002." (Pl.'s LR 56.1(b)(3) Stmt., Ex. 11, Borgialli Report at 6.) Dr. Auer, another of plaintiff's medical experts, said, "[i]t is simply not possible, under any circumstance, for a clinician to conclude that a child's death *must have been*

---

[1] Plaintiff purports to dispute the facts asserted in this paragraph but the evidence he cites does not controvert them.

2

*caused* by a particular mechanism and within a particular timeframe," and Drs. Severin and Muñoz's opinions about the timing of Steven's injuries and his cause of death "lacked medical or scientific foundation and were inexplicable in light of their training and experience." (*Id.*, Ex. 8, Auer Report at 2, 33) (emphasis in original).

On February 8, 2002 at 10:40 p.m., DuPage County Detective Gregory Figiel spoke with Dr. Severin at Rush. (Pl.'s LR 56.1(b)(3) Stmt. ¶ 23.) The police report states that Dr. Severin "guess[ed]" that "the bruising on Steven's body occurred sometime between 24 to 48 hours [earlier]." (*Id.*, Ex. 29, DuPage Cnty. Sheriff's Report at 3.) DuPage County Children's Center Investigator Boris Vrbos spoke to Dr. Muñoz for ten or fifteen minutes that night as well. (Pl.'s LR 56.1(b)(3) Stmt. ¶ 23. ) Vrbos said Dr. Muñoz told him Steven had a brain bleed on the right side, internal abdominal injuries, bruises on his head, marks on his back and legs, blood in his urine, and signs of severe brain trauma. (Defs.' LR 56.1(a)(2), Ex. G, Vrbos Dep. at 91.)

Plaintiff was arrested for Steven's murder on February 28, 2002, and tried in 2004. (Pl.'s LR 56.1(b)(3) Stmt. ¶¶ 39, 41.) At the DuPage County State's Attorney's request, Drs. Severin and Muñoz testified at the trial. (*Id.* ¶¶ 41, 46.) Both doctors testified that Steven's injuries occurred four to six hours before he arrived at Mount Sinai. (*Id.* ¶¶ 76-77.) On July 16, 2004, plaintiff was found guilty of murdering Steven and was sentenced to a sixty-five-year prison term. (Defs.' LR 56.1(a)(2) Stmt. ¶ 50.) The conviction was vacated and plaintiff was released from prison in September 2018. (*Id.* ¶ 51.) On April 17, 2019, the State dropped the charges against plaintiff. (*Id.*)

## Discussion

To prevail on a summary judgment motion, "the movant [must] show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

3

Fed. R. Civ. P. 56(a). "The court views the evidence, and draws all reasonable inferences, in the light most favorable to the nonmoving party." *Driveline Sys., LLC v. Arctic Cat, Inc.*, 936 F.3d 576, 579 (7th Cir. 2019). Summary judgment is appropriate only when no reasonable jury could find for the nonmovant. *Blasius v. Angel Auto., Inc.*, 839 F.3d 639, 644 (7th Cir. 2016).

In Counts I and III-V, plaintiff asserts claims pursuant to 42 U.S.C. § 1983 against Drs. Severin and Muñoz for their alleged violations of his Fourth and Fourteenth Amendment rights.[2] To succeed on these claims, plaintiff must show, inter alia, that Drs. Severin and Muñoz acted under color of state law. *Tom Beu Xiong v. Fischer*, 787 F.3d 389, 397-98 (7th Cir. 2015). In this case that means plaintiff must show that the doctors reached an understanding with the police to deprive plaintiff of his constitutional rights and the doctors willfully participated in joint activity with the police. *Fries v. Helsper*, 146 F.3d 452, 457 (7th Cir. 1998) ("To establish § 1983 liability through a conspiracy theory, a plaintiff must demonstrate that: (1) a state official and private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights, and (2) those individual(s) were willful participants in joint activity with the State or its agents.") (cleaned up).

Plaintiff contends a conspiracy among the doctors and police to deprive him of his constitutional rights can be inferred from: (1) the fact that the police told Dr. Severin when they arrived at Rush that Steven had been in plaintiff's care that day; (2) the fact that Dr. Severin told the police, while Steven was in surgery, that he would guess "the bruising on Steven's body was twenty-four to forty-eight hours old," but later said Steven's injuries occurred within hours of his admission to Mount Sinai; (3) Dr. Muñoz's opinion that Steven's injuries occurred within six hours of his admission to Mount Sinai; (4) the fact that investigators told plaintiff, apparently based on

---

[2] Judge Seeger dismissed the section 1983 claims plaintiff asserted against Rush. (*See* ECF 252.)

information from Dr. Severin, that "the bruises on Steven's head were inconsistent with what [plaintiff said happened]"; (5) Detective Szalinski's testimony that one of the doctors said "the onset of injury would have been pretty recent" and "something about the amount of fresh blood in Stephen's [sic] brain and that had the injuries occurred prior to the previous morning, [he] would have not been able to function in the way that Randy described"; (6) Dr. Muñoz's assessment of the CT scans of Steven's head as showing a right subdural hematoma, when surgery revealed there was none; (7) the fact that the police did not document their February 21, 2002 conversation with Dr. Muñoz until May 2002, and they did so after the prosecuting attorney asked Dr. Muñoz to confirm the investigators' recollection of that conversation; (8) Dr. Severin's opinion that Steven's injuries were the result of non-accidental trauma; and (9) the testimony of plaintiff's medical experts that Drs. Severin and Muñoz's opinions on the timing and cause of Steven's injuries have no basis.  (Pl.'s LR 56.1(b)(3) Stmt. ¶¶ 47-48, 54-56; *id.*, Ex. 29, Follow-Up Police Report at 2-3, 6; *id.*, Ex. 24, Szalinski Dep. at 94-95; *id.*, Ex. 12, Muñoz Operation Report; *id.*, Ex. 15, 5/14/02 Letter to Muñoz from Reidy; *id.*, Ex. 10, Severin Dep. at 177-79, 260; *id.*, Ex. 16, 5/14/02 Letter to Reidy from Muñoz; *id.*, Ex. 8, Auer Report at 33-37; *id.*, Ex. 11, Borgialli Report at 5-6, *id.*, Ex. 28, Teas Report at 4-5.)  Viewed favorably to plaintiff, these facts support the inference that the doctors gave the police false information about the timing and cause of Steven's injuries and the police used that information to interrogate and arrest plaintiff.

These facts do not, however, support the inference that the doctors and police agreed to, or did, frame plaintiff for Steven's murder.  First, there is no direct evidence from any source that the doctors conspired with the investigating officers to frame plaintiff.  Plaintiff's own submission of evidence on this point demonstrates the lack of direct evidence of any unlawful agreement.  (*See* Pl.'s LR 56.1(b)(3) Stmt. ¶¶ 35-59.)  The majority of evidence offered by plaintiff is of alleged

5

police misconduct in the interviewing of plaintiff and gathering and disclosing of evidence in the criminal case. (*See id.* ¶ 35 (reciting plaintiff's view of the "correct explanation for Steven's injuries); ¶¶ 36-41, 43-44 (describing law enforcement's alleged efforts to "pursue a confession" from plaintiff); ¶¶ 42, 45 (referring to the doctors but not evidencing a conspiracy); ¶¶ 46-59 (focusing on the exchange of information between the doctors and law enforcement).)

Plaintiff argues that direct evidence of an agreement between private and public actors to violate constitutional rights is often lacking, citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144 (1970). (ECF 315 at 17.) Plaintiff's reliance on that case is misplaced for a number of reasons. First, the *Adickes* Court's application of summary judgment standards was clarified in *Celotex Corp. v. Catrett*:

> [W]e do not think the *Adickes* language ... should be construed to mean that the burden is on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact, even with respect to an issue on which the non-moving party bears the burden of proof. Instead, as we have explained, the burden on the moving party may be discharged by "showing"—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case.

477 U.S. 317, 325 (1986). Arguably, the *Adickes* court's application of summary judgment standards would allow for cases to proceed past summary judgment based on the failure to disprove a key fact (there, the defendant failing to prove that no police officer was present at the scene), as opposed to the more modern view as articulated in *Celotex* that the non-moving party's *lack* of evidence on a key issue justifies the granting of summary judgment.

Moreover, in *Adickes*, unlike the instant case, the non-state actor admitted that he violated the plaintiff's constitutional rights. Specifically, *Adickes* involved a white teacher, who was with her students of color at a restaurant, and all were denied service because of the racial composition of the class. The restaurant manager admitted that he ordered the food counter supervisor to refuse

6

to serve Miss Adickes because he feared there would be violence from customers angered at seeing white and black people eating together. *Adickes*, 398 U.S. at 154. Thus, the combination of direct evidence of an unlawful act by the private actor with circumstantial evidence of the state actors' involvement is far different than the situation presented here, where there is no direct evidence of an unlawful agreement *or* illegal conduct.

However, the lack of direct evidence will not doom plaintiff's claims if there is evidence from which an agreement between the doctors and police can be inferred. Plaintiff says such an agreement can be inferred from the fact that: (1) the police and prosecutors sought to convict plaintiff "at all costs;" (2) Drs. Severin and Muñoz changed their medical opinions and worked with the police and prosecutors to cover-up inconsistent evidence; and (3) Drs. Severin and Muñoz had a motive to join the scheme. (ECF 315 at 19-24.)

As to the police and prosecutors' alleged conduct, the relevance of that information is tangential at best. While the Court can consider circumstantial evidence, the alleged unlawful conduct of the law enforcement actors sheds no light on the doctors' conduct or liability. Indeed, plaintiff's view that law enforcement was corruptly determined to frame him both by using medical evidence provided by defendants and fabricating evidence may place law enforcement in a poor light, but this conduct does nothing to further plaintiff's argument that there is circumstantial evidence of an agreement *by the doctors* to engage in misconduct.

As to plaintiff's theory that the doctors worked with law enforcement to create false evidence and cover-up favorable evidence, that argument lacks the logical consistency necessary to be meaningful. Plaintiff argues that the police failed to document obviously important and favorable medical evidence (supporting the police's allegedly fabricated view of plaintiff's guilt) provided by the doctors. (*Id.* at 21.) Even if that is true, how does law enforcement's failure to

7

include in their reports the favorable but false medical information the doctors gave them evidence an agreement between the doctors and police to violate plaintiff's constitutional rights?

The same is true for plaintiff's assessment of Dr. Munoz's February 21, 2002 interview with law enforcement wherein he provided additional information as to his treatment of Steven. Despite the information's "obvious importance in [corruptly] implicating" plaintiff, plaintiff notes that, "Munoz's account of his surgical observations or other information about Steven's care" was not included in the officers' 3-months delayed report of the interview. (ECF 315 at 21.) Once again, plaintiff fails to explain how this set of facts suggests an *agreement* between the doctors and law enforcement.[3]

Plaintiff next leans into motive as an explanation for the doctors forming an agreement with the state actors. Specifically, plaintiff argues that the doctors wanted to avoid malpractice allegations, so they framed plaintiff instead of admitting their own errors. (*Id.* at 22.) Even if the doctors fabricated their opinions about Steven's injuries, neither doctor knew with any level of certainty that their opinions would implicate plaintiff. At best, Dr. Severin knew that plaintiff was with Steven on February 8, 2002, but he had no reason to know that plaintiff was the *only* person with Steven that day.[4] (Defs.' LR 56.1(a) Stmt. ¶ 16; Pl.'s LR 56.1(b)(3) Stmt. ¶ 31 & Ex. 29 at 3

---

[3] While plaintiff need only show a material question of fact necessary for the jury to consider, and as we have explained *supra*, the officers' accuracy of their own reports (among other points raised by plaintiff) fails to show an agreement with the doctors, we feel compelled to note an even more fundamental question. If the doctors had conspired with law enforcement to frame plaintiff, one would expect that the doctors' allegedly fabricated medical observations and conclusions would be front and center in the police reports, not delayed, omitted, or not recorded at all. Yet, plaintiff's argument is that law enforcement's decision "*not* to document Munoz and Severin's *incriminating opinions*, combined with [the doctors'] coverup of the true findings during Steven's surgery, together indicate a coordinated scheme to hide evidence inconsistent with the police theory that [plaintiff] killed Steven." (ECF 315 at 21) (emphasis added). In essence, plaintiff's argument is that the doctors agreed to provide false medical information to support law enforcement's false theory of criminal liability, and that agreement is evidenced by law enforcement's failure to report, or months-long delay in reporting, the false but incriminating evidence. This argument is nonsensical and does not (alone or in conjunction with other evidence) create a material issue of fact.

[4] Plaintiff attempts to raise a material question of fact by repeatedly suggesting otherwise. Yet, a closer examination of the cited evidentiary material shows that either the doctors did not know that plaintiff was the only person who could have injured Steven, or they did not identify plaintiff as the person who injured Steven. (*Compare* Pl.'s LR 56.1(b)(3) Stmt. ¶ 42 ("[Investigating detectives] told [plaintiff] that the medical evidence against [plaintiff] showed

("[T]hese investigators arrived at the John L. & Hellen Kellogg Pavilion pediatric critical care unit floor of the hospital and me with the Chicago Police Officers, registered nurse Tammy Smith and attending physician Paul Severin in a conference room marked 537. The Chicago Police Officers related further that the mother, Kenyatta Brown was at work all day and her boyfriend Randy Liebich was watching the kids at their apartment"). Thus, plaintiff's argument regarding motive is speculative at best.[5]

To be clear, the doctors' opinions as to Steven's cause of death clearly played an important part in the decision to prosecute plaintiff. Yet, the question before the Court is not whether the doctors' opinions were significant to the prosecution. Rather, the issue is whether the doctors' allegedly improper medical assessments as to Steven's cause of death was part of an unlawful agreement to violate plaintiff's constitutional rights. On that front, plaintiff has not raised a material fact for a jury to consider. There is no evidence, direct or circumstantial, that raises a reasonable inference that any unlawful agreement between the doctors and law enforcement existed. Concisely stated, the record does not suggest that Drs. Severin and Muñoz acted under

---

that he was responsible for Steven's death, indicating that [the doctors] had told police that [plaintiff] was responsible)," *with* the cited material ("[Plaintiff] was advised of the medical evidence against him. That [law enforcement] knew he was responsible for the tragedy to Steven. That [plaintiff] was at the apartment by himself with the children."); *compare* Pl.'s LR 56.1(b)(3) Stmt. ¶ 48 (investigating detectives "had newly decided that [Steven's] bruises must have been caused while Steven was in [plaintiff's] care on the day he came to the hospital" based on "information . . . from Severin"), *with* the cited materials (showing only that Dr. Severin had the opportunity to speak with law enforcement officers during the relevant time period); *compare*, Pl.'s LR 56.1(b)(3) Stmt. ¶ 52 (doctors told law enforcement "that the injuries to Steven must have occurred while [plaintiff] was caring for Steven"), *with* the cited material, deposition testimony of the detective overseeing Steven's death investigation ("[O]ne of the doctors that examined Stephen that night, that it was his opinion that the – that the time of the onset of injury would've been pretty recent.").)

[5] The importance of this alleged fact – that the doctors knew plaintiff was the only person with Steven during the six-hour period prior to Steven's treatment at Mt. Sinai hospital – is apparent if plaintiff's theory of liability has any merit. Thus, plaintiff asserts that "[the doctors] obtained information they would need to fabricate an opinion inculpating [plaintiff] when Severin first met with police on February 8, 2002 while Steven was in surgery. Specifically, police told Severin that [plaintiff] *was alone* watching Steven during the day while Brown at work." (Pl.'s LR 56.1(b)(3) ¶ 31.) Yet, the information cited for this proposition does not show that the doctors knew plaintiff was *alone* with Steven all day, or that others were not with Steven during the relevant period. (*Id.* ¶ 31 & Ex. 29 at 3.) The reasonable inference to be drawn from the actual evidence is that the doctors knew that plaintiff might have injured Steven.

color of state law. Accordingly, their motion for summary judgment on the section 1983 claims asserted against them is granted.

In Counts VI, VII, and X, plaintiff asserts state-law claims against the doctors and Rush for malicious prosecution, intentional infliction of emotional distress, and civil conspiracy. Because the Court "has dismissed all claims over which it has original jurisdiction," 28 U.S.C. § 1367(c)(3), it declines to exercise supplemental jurisdiction over these state-law claims.

## Conclusion

For the reasons set forth above, the Court grants defendants' motion for summary judgment as to the federal claims in Counts I and III-V and denies it without prejudice as to the state-law claims in Counts VI, VII, and X, which are dismissed without prejudice to refiling in state court.

**SO ORDERED.**                                                      **ENTERED: August 9, 2023**

**M. David Weisman**
**United States Magistrate Judge**

10